United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ELINEL RABARA,

            Plaintiff,

     v.

HEARTLAND EMPLOYMENT
SERVICES, LLC,

            Defendant.

Case No. 17-CV-03770-LHK

**ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 56

      Plaintiff Elinel Rabara ("Rabara" or "Plaintiff") brings the instant lawsuit against Defendant Heartland Employment Services, LLC ("Defendant"). Before the Court is Defendant's motion for summary judgment. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Defendant's motion for summary judgment.

## I. BACKGROUND

### A. Factual Background

      Defendant Heartland is an Ohio corporation with its principal place of business in Toledo, Ohio. ECF No. 1-8, Ex. A ("Amend. Compl.") ¶ 2. Defendant is a part of the HCR ManorCare family of non-profit health care companies, which provide short and long term medical and rehabilitation care. ECF No. 56-4 ("Marangi Decl.") ¶ 4. Specifically, Defendant provides post-

1

1    hospital skilled nursing care to patients as well as long-term residential care at facilities across the

2    country, including at a facility in Sunnyvale, California. *Id.* ¶¶ 2, 4; Amend. Compl. ¶ 2.

3        Plaintiff Rabara is a San Jose, California resident, who was formerly employed as a Nurse

4    Supervisor by the Defendant at Defendant's facility located in Sunnyvale, California beginning in

5    March 2009 until she was terminated on December 10, 2014. Amend. Compl. ¶ 1; Marangi Decl. ¶

6    6, 13; ECF No. 57-1 ("Ciarimboli Decl."), Ex. 2. During this time, Plaintiff reported to Susan

7    Jacinto, Director of Nursing, and the Defendant's Human Resources ("HR") Director was Priya

8    Yadav. *See* Ciarimboli Decl., Ex. 2.

9        Plaintiff alleges, among other things, that Defendant discriminated against her during her

10   employment with Defendant. *See* Amend. Compl. In her verified amended complaint, Plaintiff

11   describes mistreatment by her coworkers beginning in 2009 when Plaintiff first began her

12   employment with Defendant. *See id.* In her opposition to Defendant's instant motion for summary

13   judgment, Plaintiff recites almost all of these allegations again and cites primarily to her verified

14   amended complaint for support. *See, e.g.*, ECF No. 57 ("Opp'n") at 5 (citing Ciarimboli Decl., Ex.

15   1 ("Amend. Compl.")).

16       As an initial matter, Plaintiff did not file her own declaration in support of her opposition.

17   Instead, only Plaintiff's attorney filed a declaration in support of Plaintiff's opposition. *See*

18   Ciarimboli Decl.

19       Defendant objects to the evidence attached to Plaintiff's attorney's declaration in support

20   of Plaintiff's opposition. Reply at 10–15. Specifically, Defendant objects because the exhibit on

21   which Plaintiff's opposition relies most heavily is Plaintiff's verified amended complaint.

22   Defendant believes that the allegations in Plaintiff's verified amended complaint lack

23   authentication, relevance, foundation, and constitute hearsay. *See* Reply at 10 n.6. Second,

24   Defendant objects because the only declaration submitted in support of Plaintiff's opposition is the

25   declaration of Plaintiff's attorney, who Defendant contends does not have personal knowledge to

26   authenticate any of the exhibits attached to Plaintiff's attorney's declaration, including the verified

27   amended complaint. *See* Reply at 10–11 (discussing the Ciarimboli Decl. and citing *Lanovaz v.*

28

United States District Court
Northern District of California

*Twinings N. Am., Inc.*, No. 12-cv-2646-RMW, 2016 WL 5485819, at (N.D. Cal. Sept. 2, 2016) ("An attorney declaration based on review of documents constitutes 'second-hand knowledge.'"), *aff'd sub nom.*, 726 F. App'x 590 (9th Cir. 2018)). As a result, Defendant raises a series of objections to the evidence attached to Plaintiff's attorney's declaration. *See* Reply at 11–15. For instance, Defendant argues that Plaintiff cannot establish the authenticity of the complaints allegedly written by Plaintiff and submitted to Plaintiff's supervisors. Reply at 11 (citing *Cristobal v. Siegel*, 26 F.3d 1488, 1494 (9th Cir. 1994) ("This court has consistently held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment.")). Defendant also argues that Plaintiff's doctors' notes constitute hearsay. Reply at 11–12; *see, e.g.*, *Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 n. 4 (9th Cir. 1995) (inadmissible hearsay cannot be used to defeat summary judgment).

Even considering Plaintiff's verified amended complaint and all of the additional evidence attached to Plaintiff's attorney's declaration in support of Plaintiff's opposition, the Court grants Defendant's motion for summary judgment. Thus, the Court declines to go through each and every one of Defendant's objections, and OVERRULES Defendant's objections. *See* Reply at 10–15.[1]

In the paragraphs that follow, the Court briefly discusses the facts relevant to the instant summary judgment motion.

### 1. Plaintiff's Disability

Plaintiff suffers from Von Hippel Lindau Syndrome ("VLS"), an inborn genetic eye condition that rendered Plaintiff blind in her left eye. Amend. Compl. ¶ 7. Because of her eye condition, Plaintiff wears shaded glasses. *Id.* The glasses partially conceal Plaintiff's eye, which is unsightly due to numerous surgeries that Plaintiff has had throughout her life. *Id.*

---

[1] Nonetheless, the Court notes that the Ninth Circuit has held that a verified complaint may be considered as an affidavit in opposition to summary judgment "if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 132 n.14 (9th Cir. 2000). In the instant case, Plaintiff has signed and dated her verified amended complaint, but the Court does not reach whether the verified amended complaint sets forth specific facts admissible in evidence. *See* Amend. Compl. at 61. Defendant may well have valid objections.

Case No. 17-CV-03770-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

## 2. Plaintiff's Allegations

Plaintiff brought a series of allegations against at least seventeen different co-workers for various actions. Plaintiff's allegations before March 12, 2014 are as follows: (1) in May and June 2009, a late shift nurse named Santosh Sahijpal refused to take Plaintiff's orders and accused Plaintiff of neglecting her duties and not finishing her work on time; (2) in June 2009, a nurse named Ligaya Rabi, who was Plaintiff's subordinate, hid a patient's call button and got angry at Plaintiff when the patient's call button light went off; (3) in the summer of 2009, Assistant Director of Nursing Milagros Rea asked Plaintiff why she wore shaded glasses and before Plaintiff answered, instructed Plaintiff to cut her hair so that it did not cover her eye and to get lighter colored glasses; (4) in the fall of 2009, a late shift nurse named Jessie Bongato told Plaintiff that she was "such a complainer" and that she "made a mess out of a single pill" by getting all the nurses written up; (5) in December 2009, a nurse named "Joy" refused to help Plaintiff with a patient and then later confronted Plaintiff after Plaintiff told Joy that Plaintiff could write her up for her behavior; (6) in June 2010, the Staff Development Manager Vicky Chan ("Chan") told two other co-workers that Plaintiff "was partially blind, and, therefore, prone to mistakes"; (7) in December 2010, Defendant sent Plaintiff a letter reminding her that the company did not allow overtime and that Plaintiff should prioritize and schedule her work such that overtime was unnecessary; (8) in January 2011, Defendant removed Plaintiff's limited work-hour accommodation; (9) in June 2011, Plaintiff's eye filled with blood and nurse Devinder Kaur stated that she could not tolerate looking at Plaintiff's eye because it looked "so gross," and Director of Nursing Susan Jacinto ("Jacinto") suggested that Plaintiff get a cold compress and put it on her eye; (10) in October 2011, Plaintiff told the scheduler named Bessie Aguilon ("Aguilon") that she had been previously accommodated with fewer shifts per week due to her eye condition; (11) also in October 2011, Aguilon visited Plaintiff at her home after Plaintiff called in sick three times in three months and then later threatened to call Plaintiff's mother and sister; (12) in "late" 2011, Plaintiff's eye filled up with blood and some of her colleagues were unable to look at Plaintiff because her eye was so red; (13) in December 2011, Plaintiff wrote a complaint about a kitchen

4

staff member, Tony, who was "persistently antagonistic toward her, denying her meals, delaying preparation of her patients' meals, and shouting at her impatiently"; (14) in August 2012, a nurse name "Averee" refused to help Plaintiff feed one of his patients because he was busy, so another nurse named "Erika" helped Plaintiff; (15) throughout 2012, Plaintiff complained about her schedule and requested a four-day work week to provide accommodations for her disabilities, but Defendant denied Plaintiff that accommodation and "kept her schedule inconsistent and full-time"; (16) in summer of 2013, HR Director Priya Yadav ("Yadav") refused to answer a call light and instructed Plaintiff to help a patient, which resulted in Plaintiff having only a few minutes for her lunch break and then a few days later, Plaintiff was written up for failing to take a full 30-minute break that day; and (17) in August 2013, a nurse named "Jose" got angry and shouted at Plaintiff because a patient was missing. Amend. Compl. ¶¶ 11–16, 19, 22, 24–25, 45–47, 52–54, 58, 61, 70–71.

Plaintiff's allegations after March 12, 2014 are as follows: (1) around April 9, 2014, Plaintiff called in sick; however, the scheduler Aguilon told Plaintiff that there were only six nurses scheduled, when in fact the schedule said there were eight, and as a result, Plaintiff was forced to work when she was sick; (2) Aguilon scheduled Plaintiff for five-day work weeks starting in May 2014; (3) on June 6, 2014, Plaintiff "expressed her concerns about Aguilon and Jacinto's close friendship impacting nurses' schedules" and Plaintiff's belief "that duties and schedules were consistently manipulated based upon favoritism" to Administrator Melinda Dechert ("Dechert"); (4) on November 26, 2014, HR Director Yadav left Plaintiff a voicemail saying that Plaintiff's employment and benefits would end on December 16, 2014; and (5) on December 10, 2014, Plaintiff was terminated. Amend. Compl. ¶¶ 88–90, 91–98, 106, 108.

### 3. Plaintiff's Leave Requests

This case largely centers around Plaintiff's leave requests. Defendant had a leave of absence policy that authorized employees to take medical leave under the Family and Medical Leave Act and the California Rights Act. Marangi Decl. ¶ 5. Defendant also had a leave of absence policy that provided employees a Personal Leave of Absence for 30-day periods at a time.

5

*Id.* With approval from HR, employees could extend their personal leaves of absence. *Id.*; *see also id.*, Ex. A ("2014 Employee Handbook"). During the course of her employment, Plaintiff requested three leaves of absence and received three leaves of absence. Plaintiff also received 19 out of 20 requested extensions.

Plaintiff took her first leave of absence on June 7, 2010, after she fell at home and fractured her rib. Marangi Decl. ¶ 7; *see also id.,* Ex. C ("First Leave of Absence Forms"). When she was originally granted leave, Plaintiff's anticipated date of return was July 7, 2010. First Leave of Absence Forms at HES249. Plaintiff then requested and received several extensions. On July 7, 2010, for instance, Plaintiff's doctor wrote a note indicating that Plaintiff may return to work on July 15, 2010. *Id.* at HES255. On July 14, 2010, Plaintiff provided an ambulatory care work/school note ("ambulatory care note") indicating that Plaintiff could not work until August 1, 2010. *Id.* at HES258. Plaintiff provided an additional ambulatory care note on August 30, 2010, that is not legible but indicates that Plaintiff needed another leave extension. *Id.* at HES261. Plaintiff provided a third ambulatory care note on September 30, 2010, that stated that Plaintiff should return to work on October 11, 2010. *Id.* at HES263. A fourth note on October 7, 2010, provided for Plaintiff's return on November 1, 2010. *Id.* at HES265. Finally, on November 24, 2010, Plaintiff's doctor cleared her to return to work on December 1, 2010. *Id.* at HES268. Defendant granted every request for leave and, after almost six months of leave that started in June 2010, Plaintiff returned to work on December 1, 2010. Marangi Decl. ¶ 7.

Plaintiff took her second leave of absence on September 6, 2013, after a car accident that resulted in injuries to Plaintiff's neck and back. Marangi Decl. ¶ 8; *see also id.*, Ex. D ("Second Leave of Absence Forms"). The doctor's note stated that "[p]atient may return to work once pain improved." Second Leave of Absence Forms at HES272. Defendant granted Plaintiff's leave of absence request. *Id.* at HES276. Plaintiff then requested and received several extensions. On September 23, 2013, Plaintiff provided a doctor's note that stated that her expected duration of leave would last until October 1, 2013. *Id.* at HES273. On October 1, 2013, Plaintiff provided a follow-up doctor's note that stated that "[p]atient temporarily cannot return to work yet, is

undergoing evaluation." *Id.* at HES285. On November 4, 2013, Plaintiff's doctor wrote that "[p]atient is currently undergoing physical therapy for back and neck issues. Expected to return to work on December 1, 2013." *Id.* at HES287. On November 22, 2013, Plaintiff's doctor wrote that "[p]atient [is] still currently being managed and treated for medical issues. Patient will require treatment for another month." *Id.* at HES289. On December 17, 2013, Plaintiff's doctor wrote that "[p]atient [is] still undergoing medical treatment at this time. Currently anticipate patient returning to work beginning February 2014." *Id.* at HES290. On January 15, 2014, Plaintiff's doctor wrote that Plaintiff was still being treated and could not return to work. *Id.* at HES291. On February 3, 2014, Plaintiff's doctor wrote that she could return back to work starting on March 1, 2014. *Id.* at HES292. On February 10, 2014, Plaintiff's doctor wrote that Plaintiff was still being treated for issues from her car accident and that Plaintiff was also seeing an eye specialist for a genetic chronic eye issue. *Id.* at HES293. On February 19, 2014, Plaintiff's doctor wrote that "[p]atient can return to work on 3/7/2014 but on a limited schedule 4 days a week since will be continuing physical therapy." *Id.* at HES294. On March 4, 2014, Plaintiff's doctor wrote that Plaintiff is still undergoing physical therapy and is restricted from lifting items heavier than 30 pounds. *Id.* at HES295. Finally, on March 6, 2014, Plaintiff's doctor wrote that Plaintiff "may return to work on 3/7/2014 without restrictions." *Id.* at HES296.

Defendant granted every request for leave, and, after almost six months of leave that started in September 2013, Plaintiff returned to work on March 15, 2014. Marangi Decl. ¶¶ 8–9; ECF No. 56-13 ("Hong Decl."), Ex. C ("Rabara Dep. Vol. III") at 483:13–495:5. Defendant's time records reflect that Plaintiff worked no more than four-day work weeks from that date through April 30, 2014, when Plaintiff took her third leave of absence. Marangi Decl. ¶ 9; *see also id.*, Ex. E ("Time Sheets"); Rabara Dep. Vol. III at 484:19–485:8.

Plaintiff took her third leave of absence on April 30, 2014, for rest due to her pre-existing eye condition. Marangi Decl. ¶ 10; *see also id.*, Ex. F ("Third Leave of Absence Forms"). Plaintiff's doctor wrote on April 30, 2014, that Plaintiff was being treated for a recurrent chronic medical illness and that Plaintiff should be excused for the next two weeks for treatment. Third

United States District Court
Northern District of California

Leave of Absence Forms at HES297. On May 1, 2014, Defendant's HR Director Yadav wrote to

Plaintiff that Plaintiff had "exhausted [her] 6 months of leave as of March 6, 2014" and is "not

authorized for any leave." *Id.* at HES298. However, Defendant ultimately granted leave. On May

6, 2014, Yadav sent a follow-up letter asking Plaintiff to complete a Leave of Absence form and to

have Plaintiff's doctor complete some paperwork. *Id.* at HES300. Plaintiff then requested and

received several extensions. For instance, Plaintiff's doctor wrote on May 9, 2014, that Plaintiff is

still receiving treatment and should be excused until June 9, 2014. *Id.* at HES301. Defendant

granted the extension. On June 5, 2014, Plaintiff's doctor provided a letter stating that Plaintiff

needs further care and should be excused from work until August 31, 2014. *Id.* at HES322. On

June 27, 2014, Yadav, granted Plaintiff's requests for extension of leave of absence through

August 31, 2014. *Id.* at HES323–24. On August 11, 2014, Plaintiff's doctor wrote that Plaintiff

would be undergoing an eye procedure on August 20, 2014 and would need to return for an

artificial eye placement about two months after that. *Id.* at HES341. The doctor wrote to "[p]lease

excuse [Plaintiff] from work for 3 months, until 12/1/14." *Id.* Defendant granted the request for

extension. Then on November 22, 2014, Plaintiff's doctor wrote that Plaintiff is unable to return to

work at this time and is currently seeing "physical therapy, eye specialists" and therefore,

Plaintiff's next "anticipated release back to work is 4/1/2015." *Id.* at HES342.

### 4. Plaintiff's Termination

After receiving Plaintiff's final extension request and November 22, 2014 doctor's note

requesting four additional months of leave from December 1, 2014 to April 1, 2015, Defendant's

then-acting[2] HR Director, Grace Nunez, brought the request to the attention of Greg Marangi

("Marangi"), the Regional HR Manager for Defendant. Marangi Decl. ¶ 11. Marangi then met

with John Gallick, the Regional Director of Operations, and Marin Mayhew, the Area HR

Director, to discuss Plaintiff's continued leave of absence. *Id.* ¶ 12; Hong Decl., Ex. G ("Marangi

Dep.") at 32:19–33:6. The group reviewed Plaintiff's medical leave history and "determined that,

---

[2] Marangi declared that the Defendant's permanent HR Director, Yadav, was on vacation out of
the country at the time. Marangi Decl. ¶ 11.

based on the review of her record as a whole, including the multiple requests for leaves of absences and upwards of 20 requests for extensions of those leaves, we could no longer treat any single request for an excused absence for [Plaintiff] as a request for definite leave." Marangi Decl. ¶ 12. "Because of extension after extension, [Plaintiff's] leave appeared indefinite, and we did not feel with any measure of reasonable certainty that [Plaintiff] would actually return on or even near the date indicated on her doctor's note, if at all." *Id.* As a result, the group "recommended that [Plaintiff's] employment be terminated." *Id.*; *see also* Marangi Dep. at 40:22–44:22. The decision to terminate was based on "a consideration that there didn't seem to be an end in sight because of the repeated extensions. And [Plaintiff] had already been accommodated with 58 weeks of leave." Marangi Dep. at 43:22–44:2.

As a result of this decision, on December 11, 2014, Nunez sent Plaintiff a letter notifying Plaintiff that her employment was ended effective December 10, 2014. Marangi Decl. ¶ 13; *see also id.*, Ex. G ("Termination Letter"). The termination letter states: "We are very sorry that a return to work was not possible following your leave of absence. As discussed, further leave is not available, and no accommodation is possible that would allow you to return to a position with us." *See* Termination Letter. The evidence shows that Plaintiff has not worked since her third leave of absence on April 30, 2014, nearly five years ago, or her termination in December 2014, nearly four and a half years ago. *See* Hong Decl., Ex. A ("Rabara Dep. Vol. I") at 21:11–13.

**B. Procedural History**

On October 26, 2016, Plaintiff filed in the Superior Court of California a complaint against several defendants who are no longer in the lawsuit (referred to as "dismissed defendants"). ECF No. 1-8, Ex. H ("Compl."). On February 16, 2017, Plaintiff filed her verified amended complaint against the instant Defendant, as well as the dismissed defendants, alleging: (1) violation of California Health & Safety Code § 1278.5; (2) disability discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Gov. Code § 12490(a); (3) failure to accommodate disability in violation of the FEHA, Gov. Code § 12940(m); (4) failure to engage in interactive process in violation of the FEHA, Gov. Code § 12490(n); (5) retaliation in violation of

9

the FEHA, Gov. Code § 12490(h); (6) hostile work environment harassment in violation of the FEHA, Gov. Code § 12490(j); (7) failure to prevent harassment, discrimination, or retaliation in violation of the FEHA, Gov. Code § 12490(k); (8) adverse action in violation of public policy; (9) violation of Labor Code §§ 98.6 & 1102.5; and (10) violation of Labor Code §§ 6310 & 6311. *See* Amend. Compl. Plaintiff sought, inter alia, compensatory damages, punitive damages, and attorneys' fees and costs. *See id.* On May 8, 2017, and May 19, 2017, Plaintiff dismissed all claims asserted against the dismissed defendants, and thus the instant Defendant is the only remaining defendant in the action. *See id.*, Exs. E & G.

On June 30, 2017, Defendant removed the case to the United States District Court for the Northern District of California. ECF No. 1 ("Removal"). Defendant asserted that the Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1132 because the amount in controversy exceeds $75,000 and the parties are diverse. *See id.* Defendant answered the verified amended complaint on July 7, 2017. ECF No. 6 ("Answer").

On December 17, 2018, Defendant filed the instant motion for summary judgment. ECF No. 56 ("Mot."). Plaintiff opposed on December 31, 2018. ECF No. 57 ("Opp'n"). Defendant replied on January 7, 2019. ECF No. 58 ("Reply").

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or

United States District Court
Northern District of California

discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

## III. DISCUSSION

As discussed above, Plaintiff asserts the following ten claims against Defendant: (1) violation of California Health & Safety Code § 1278.5; (2) disability discrimination in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12490(a); (3) failure to accommodate disability in violation of the FEHA, Cal. Gov. Code § 12940(m); (4) failure to engage in interactive process in violation of the FEHA, Cal. Gov. Code § 12490(n); (5) retaliation in violation of the FEHA, Cal. Gov. Code § 12490(h); (6) hostile work environment harassment in violation of the FEHA, Cal. Gov. Code § 12490(j); (7) failure to prevent harassment, discrimination, or retaliation in violation of the FEHA, Cal. Gov. Code § 12490(k); (8) adverse action in violation of public policy; (9) violation of Labor Code §§ 98.6 & 1102.5; and (10) violation of Labor Code §§ 6310 & 6311. *See* Amend. Compl.

Defendant moves for summary judgment on all of Plaintiff's claims. *See* Mot. Defendant also moves for summary judgment on Plaintiff's claim for punitive damages. *See id.* Below, the Court first addresses Plaintiff's first claim for violation of California Health & Safety Code § 1278.5. Second, the Court addresses together Plaintiff's second, third, fourth, fifth, sixth, and seventh claims for alleged violations of the FEHA, Cal. Gov. Code § 12940(a), (m), (n), (h), (j), & (k), as well as Plaintiff's eighth claim for adverse action in violation of public policy. Third, the Court discusses Plaintiff's ninth claim for violation of Labor Code §§ 98.6 & 1102.5. Fourth, the Court addresses Plaintiff's tenth claim for violation of Labor Code §§ 6310 & 6311. Finally, the

1    Court addresses Defendant's argument that Plaintiff's claim for punitive damages fails as a matter

2    of law.

3         **A. Claim #1: California Health & Safety Code § 1278.5**

4         Plaintiff's first claim asserts a right to recover for Defendant's violations of California

5    Health & Safety Code § 1278.5, which prohibits discrimination or retaliation against employees

6    for making complaints about unsafe patient care or conditions. Amend. Compl. ¶¶ 111–26.

7    Specifically, California Health & Safety Code § 1278.5(b)(1)(A) provides that "[n]o health facility

8    shall discriminate or retaliate, in any manner, against any patient, employee, member of the

9    medical staff, or any other health care worker of the health facility because that person has . . .

10   [p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for

11   accrediting or evaluating the facility, or the medical staff of the facility, or to any other

12   governmental entity." Plaintiff argues that Defendant discriminated and retaliated against Plaintiff

13   because she reported concerns about patient care, services, and facility conditions. Amend. Compl.

14   ¶¶ 111–16.

15        Defendant argues that Defendant is entitled to summary judgment on Plaintiff's California

16   Health & Safety Code § 1278.5 claim because the claim is barred by the statute of limitations. *See*

17   Mot. at 24. California Health & Safety Code § 1278.5 does not specify a time period in which a

18   claim for a violation of the statute must be filed. However, the California Court of Appeal has

19   recognized that the one-year statute of limitations for an action upon a statute for penalty is

20   applicable to California Health & Safety Code § 1278.5. *See Melamed v. Cedars-Sinai Med. Ctr.*,

21   8 Cal. App. 5th 1271, 1287 (Cal. Ct. App.) (explaining that because Health and Safety Code §

22   1278.5 is a "statute for a penalty," the one-year statute of limitations provided for in California

23   Code of Civil Procedure § 340 is applicable), *review granted and cause transferred on other*

24   *grounds*, 395 P.3d 1110 (2017) (citing Cal. Code Civ. Proc. § 340). Here, Plaintiff filed her

25   complaint on October 26, 2016. *See* Compl. Therefore, the applicable statute of limitations for

26   Plaintiff's California Health & Safety Code § 1278.5 claim reaches back one-year, to October 26,

27   2015.

28
                                                    12
     Case No. 17-CV-03770-LHK
     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff does not address the statute of limitations issue nor does Plaintiff provide evidence of retaliation for patient safety complaints occurring on or after October 26, 2015. *See* Opp'n. Instead, Plaintiff alleges—and Defendant agrees—that Plaintiff's employment terminated on December 14, 2014. Amend. Compl. ¶ 108. Moreover, Plaintiff agreed that she has not worked for anyone, including Defendant, since December 2014. *See* Rabara Dep. Vol. I at 21:11–13. Accordingly, because Plaintiff provided no evidence of retaliation for patient safety complaints occurring on or after October 26, 2015, her California Health & Safety Code § 1278.5 is barred by the statute of limitations. Accordingly, the Court GRANTS Defendant summary judgment on this claim.

### B. Claims #2–8: Violations of the FEHA, Cal. Gov. Code § 12940(a), (m), (n), (h), (j), & (k) and Adverse Employment Action in Violation of Public Policy

Plaintiff's second through seventh claims assert a right to recover for violations of the FEHA, Cal. Gov. Code § 12940(a) ("disability discrimination"), (m) ("failure to accommodate"), (n) ("failure to engage in the interactive process"), (h) ("retaliation"), (j) ("hostile work environment harassment"), and (k) ("failure to prevent harassment, discrimination, or retaliation"). *See* Amend. Compl. ¶¶ 127–97. Plaintiff's eighth claim asserts a right to recover for an adverse employment action in violation of public policy, as codified in the FEHA. *Id.* ¶¶ 198–210. The relevant provisions of FEHA provide:

It is an unlawful employment practice . . .

(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.
. . .
(h) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.
. . .

13

> (j)(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status, to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract.
>
> . . .
>
> (k) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.
>
> . . .
>
> (m)(1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation.
>
> . . .
>
> (n) For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.

*See* Cal. Gov. Code § 12940(a), (h), (j), (k), (m), & (n).

Defendant argues it is entitled to summary judgment on all of Plaintiff's FEHA claims as well as Plaintiff's eighth claim for adverse employment action. *See* Mot. at 12–22; Reply at 1–9. First, Defendant argues that all of the FEHA claims predicated on conduct before March 12, 2014, are barred by the applicable statute of limitations. Mot. at 12–16. Second, Defendant argues that Plaintiff's disability discrimination claim, Cal. Gov. Code § 12940(a), fails because Plaintiff was per se no longer capable of performing her essential job functions. Mot. at 16–18. Third, Defendant argues Defendant should be granted summary judgment on Plaintiff's failure to accommodate claim, Cal. Gov. Code § 12940(m). Mot. at 18–20. Fourth, Defendant argues Defendant should be granted summary judgment on Plaintiff's failure to engage in the interactive process claim, Cal. Gov. Code § 12940(n). Mot. at 19; Reply at 8–9. Fifth, Defendant argues Defendant should be granted summary judgment on Plaintiff's hostile work environment

Case No. 17-CV-03770-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

harassment claim, Cal. Gov. Code § 12940(j). Mot. at 20–21. Sixth, Defendant argues it should be granted summary judgment on Plaintiff's retaliation claim, Cal. Gov. Code § 12940(h), and Plaintiff's adverse employment action in violation of public policy claim. Mot. at 21–22. Finally, Defendant argues Defendant should be granted summary judgment on Plaintiff's failure to prevent harassment, discrimination, or retaliation claim, Cal. Gov. Code § 12940(k), as the claim is entirely derivative of Plaintiff's other FEHA claims. Mot. at iii. The Court explores each of Defendant's arguments below. For the reasons given below, the Court GRANTS Defendant summary judgment on all of Plaintiff's FEHA claims.

### 1. Statute of Limitations

Defendant argues first that Plaintiff's FEHA claims that are predicated on conduct before March 12, 2014 are time barred. Mot. at 12. The Court agrees. To bring a claim under the FEHA, Plaintiff must file an administrative complaint with the Department of Fair Employment and Housing ("DFEH"). *See Trovato v. Beckman Coulter, Inc.*, 192 Cal. App. 4th 319, 323 (Cal. Ct. App. 2011). "The administrative complaint must be filed within one year of the date on which the unlawful practice occurred." *Id.* Here, Plaintiff filed her DFEH complaint on March 12, 2015. Marangi Decl. ¶ 14; *see also id.*, Ex. H at HES440. Thus, the applicable statute of limitations for Plaintiff's FEHA claims reaches back one-year, to March 12, 2014. Therefore, Plaintiff's FEHA claims that are predicated on conduct that predate March 12, 2014 are time barred.

Plaintiff does not contest that March 12, 2014 is the applicable statute of limitations date. *See* Opp'n at 18–22. Instead, Plaintiff argues that her FEHA claims are saved by what is known as the continuing violation doctrine. *See id.* The continuing violation doctrine "allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period." *Trovato*, 192 Cal. App. 4th at 326 (citing *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 802 (2001)). An employer's unlawful actions constitute a continuing violation if "(1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency; *and* (3) they have not acquired a degree of 'permanence' so that employees are on notice that further efforts at informal conciliation with the employer to obtain

15

accommodation or end harassment would be futile." *Id.* (emphasis added); *see also Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1059–60 (2005) (applying the continuing violation doctrine to claim for retaliation).

In the subsections that follow, the Court discusses the allegations in Plaintiff's verified amended complaint and considers the similarity and frequency prongs of the continuing violation doctrine. Because the Court finds that there is no genuine fact dispute as to similarity and frequency, the Court need not consider the permanence prong and concludes that the continuing violation doctrine is inapplicable. Thus, Plaintiff cannot rely on employer conduct that predates March 12, 2014 to support her FEHA claims.

### a. Plaintiff's Allegations

Plaintiff's allegations before the March 12, 2014 statute of limitations date consist of the following: (1) in May and June 2009, a late shift nurse name Santosh Sahijpal refused to take Plaintiff's orders and accused Plaintiff of neglecting her duties and not finishing her work on time; (2) in June 2009, a nurse named Ligaya Rabi, who was Plaintiff's subordinate, hid a patient's call button and got angry at Plaintiff when the patient's call button light went off; (3) in the summer of 2009, Assistant Director of Nursing Milagros Rea asked Plaintiff why she wore shaded glasses and before Plaintiff answered, instructed Plaintiff to cut her hair so that it did not cover her eye and to get lighter colored glasses; (4) in the fall of 2009, a late shift nurse named Jessie Bongato told Plaintiff that she was "such a complainer" and that she "made a mess out of a single pill" by getting all the nurses written up; (5) in December 2009, a nurse named "Joy" refused to help Plaintiff with a patient and then later confronted Plaintiff after Plaintiff told Joy that Plaintiff could write her up for her behavior; (6) in June 2010, the Staff Development Manager Chan told two other co-workers that Plaintiff "was partially blind, and, therefore, prone to mistakes"; (7) in December 2010, Defendant sent Plaintiff a letter reminding her that the company did not allow overtime and that Plaintiff should prioritize and schedule her work such that overtime was unnecessary; (8) in January 2011, Defendant removed Plaintiff's limited work-hour accommodation; (9) in June 2011, Plaintiff's eye filled with blood and nurse Devinder Kaur stated

that she could not tolerate looking at Plaintiff's eye because it looked "so gross," and Director of Nursing Jacinto suggested that Plaintiff get a cold compress and put it on her eye; (10) in October 2011, Plaintiff told the scheduler, Aguilon, that she had been previously accommodated with fewer shifts per week due to her eye condition; (11) also in October 2011, Aguilon visited Plaintiff at her home after she called in sick three times in three months and then later threatened to call Plaintiff's mother and sister; (12) in "late" 2011, Plaintiff's eye filled up with blood and some of her colleagues were unable to look at Plaintiff because her eye was so red; (13) in December 2011, Plaintiff wrote a complaint about a kitchen staff member, Tony, who was "persistently antagonistic toward her, denying her meals, delaying preparation of her patients' meals, and shouting at her impatiently"; (14) in August 2012, a nurse name "Averee" refused to help Plaintiff feed one of Averee's patients because Averee was busy, so another nurse named "Erika" helped Plaintiff; (15) throughout 2012, Plaintiff complained about her schedule and requested a four-day work week to provide accommodations for her disabilities, but Defendant denied Plaintiff that accommodation and "kept her schedule inconsistent and full-time"; (16) in summer of 2013, Yadav refused to answer a call light and instructed Plaintiff to help a patient, which resulted in Plaintiff having only a few minutes for her lunch break and then a few days later, Plaintiff was written up for failing to take a full 30-minute break that day; and (17) in August 2013, a nurse named "Jose" got angry and shouted at Plaintiff because a patient was missing. Amend. Compl. ¶¶ 11–16, 19, 22, 24–25, 45–47, 52–54, 58, 61, 70–71,

Plaintiff's allegations after March 12, 2014 consist of the following: (1) around April 9, 2014, Plaintiff called in sick; however, the scheduler Aguilon told Plaintiff that there were only six nurses scheduled, when in fact the schedule said there were eight, and as a result, Plaintiff was forced to work when she was sick; (2) Aguilon scheduled Plaintiff for five-day work weeks starting in May 2014; (3) on June 6, 2014, Plaintiff "expressed her concerns about Aguilon and Jacinto's close friendship impacting nurses' schedules" and Plaintiff's belief "that duties and schedules were consistently manipulated based upon favoritism" to Administrator Dechert; (4) on November 26, 2014, HR Director Yadav left Plaintiff a voicemail saying that Plaintiff's

17

1  employment and benefits would end on December 16, 2014; and (5) on December 10, 2014,

2  Plaintiff was terminated. Amend. Compl. ¶¶ 88–90, 91–98, 106, 108.

3       Having discussed Plaintiff's allegations, the Court turns to the similarity prong of the

4  continuing violation doctrine to determine if Plaintiff can rely on employer conduct that occurred

5  after the March 12, 2014 statute of limitations date.

6       **b. Similarity**

7       The first prong of the continuing violation doctrine requires that the discriminatory acts

8  outside the limitations period be "sufficiently similar in kind" to those inside the limitations

9  period. *Richards*, 26 Cal. 4th at 802. The Supreme Court of California has explained that "similar

10 kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably

11 accommodate disability, may take different forms." *Id.* "A continuing violation may be established

12 by demonstrating 'a company wide policy or practice' or 'a series of related acts against a single

13 individual.'" *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 64 (Cal. Ct. App. 2000)

14 (quoting *Green v. L.A. Cnty. Superintendent of Schools*, 883 F.2d 1472, 1480 (9th Cir. 1989)). "In

15 the latter instance, the question boils down to whether sufficient evidence supports a determination

16 that the alleged discriminatory acts are related closely enough to constitute a continuing violation."

17 *Id.* at 65 (quotation marks and brackets omitted) (citing *Green*, 883 F.2d at 1480–81). Defendant

18 argues that "Plaintiff fails to allege, let alone prove, that conduct pre-dating March 2014 is

19 sufficiently similar in kind to conduct since March 2014 to support a continuing violation." Mot.

20 at 13–14. Specifically, Defendant argues that the misconduct was perpetuated by different

21 individuals, varied in nature, and without any common motivation or purpose. Reply at 1–3. For

22 the reasons given below, the Court agrees with Defendant that there is no genuine factual dispute

23 as to similarity.

24       First, Plaintiff's above described allegations demonstrate varied misconduct by different

25 individuals without any common motivation or purpose. Such allegations are insufficient to

26 support a finding of similarity. For example, in *Morgan,* the California Court of Appeal

27 determined that the multiple decisions to not rehire the plaintiff were not a continuing violation

28

because they constituted a "series of decisions made by different decision makers," and there was "no evidence the decisions were connected to each other in any way." 88 Cal. App. 4th at 65–67. Instead, the court found that the situation involved a series of "isolated employment decisions." *Id.* at 66; *see also, e.g.*, *Stanley v. Sweetwater Union High Sch. Dist.*, No. D058854, 2012 WL 1029456, at *4 (Cal. Ct. App. Mar. 27, 2012) ("[H]ere, the evidence shows that promotion decisions and the reorganization decision are dissimilar because they were "made by many different decision makers, with no evidence the decisions were connected to each other in any way."). Here, like in *Morgan*, Plaintiff's allegations span five years, across seventeen different actors, and Plaintiff provides no evidence that the actions were related or connected to each other in any way. Instead, Plaintiff's allegations consist of isolated incidents of different forms of conduct and complaints against seventeen different co-workers, many of whom were subordinate to Plaintiff.

The Ninth Circuit in *Green* found no continuing violation where the alleged misconduct inside and outside the statute of limitations period were unrelated. 883 F.3d at 1481. Specifically, in *Green*, the conduct outside the statute of limitations included harassment from other employees and the defendant's failure to train and relocate plaintiff. *Id.* The conduct inside the statute of limitations in *Green* involved plaintiff's discharge and defendant's failure to place plaintiff on medical leave and to provide medical benefits. *Id.* The Ninth Circuit found such conduct unrelated, and as a result, held that the continuing violation doctrine did not apply.

The instant case looks like *Green*. First, Plaintiff's allegations before the March 12, 2014 statute of limitations date are mostly focused on complaints against co-workers, including co-workers who are subordinate to Plaintiff, and describe incidents of refusal to help Plaintiff with patients, and comments about Plaintiff being a complainer. For instance, Plaintiff's June 2009 argument with nurse Santosh Sahijpal concerned issues about Plaintiff not finishing her work on time. *See* Amend. Compl. ¶ 13. In December 2011, Plaintiff wrote a complaint about a kitchen staff member, Tony, who was "persistently antagonistic toward her, denying her meals, delaying preparation of her patients' meals, and shouting at her impatiently." The confrontation in August

19

2012 occurred because nurse Averee refused to help Plaintiff feed one of Averee's patients because Averee was busy. *Id.* ¶ 61. In August 2013, a nurse named "Jose" got angry and shouted at Plaintiff because a patient was missing. In contrast to the pre-March 12, 2014 allegations, the post-March 12, 2014 allegations have to do exclusively with Plaintiff's schedule, request for leave, and termination. *See id.* ¶¶ 88–90, 91–98, 106, 108. Under *Green*, the unrelated nature of the conduct inside and outside of the statute of limitations period renders the continuing violation doctrine inapplicable.

Plaintiff responds that "although Defendant's acts took different forms, they were inextricably part of a bullying culture that Defendant tolerated and encouraged against Plaintiff." Opp'n at 19. However, the record demonstrates a lack of a bullying culture and a lack of common motivation or purpose. During her deposition, Plaintiff conceded that some of her alleged wrongdoers' misconduct was caused by stress and fatigue. For instance, Plaintiff stated that she believes that nurse Ligaya Rabi "harass[ed]" her because "[e]verbody's tired," "[l]ack of staff, overwhelmed with work," "[s]he's also stressed out," "I think everybody needs help," and "[s]he's very tired and stressed out." *See* Rabara Dep. Vol. I at 114:8–14. Similarly, when asked about why nurse Josi "harassed" Plaintiff, Plaintiff stated, "I think Josi – he's tired," and "I think they're stressed out; they're tired." *Id.* at 115:5–11; *see also* Hong Decl., Ex. B ("Rabara Dep. Vol. II") at 243:20–244:10 ("[E]verybody's stressed and everybody is tired.").

Moreover, Plaintiff also testified that she did not believe that her alleged wrongdoers were working with each other. *See, e.g.*, Rabara Dep. Vol. III at 570:17–573:3 ("Do you feel like Santosh Sahijpal and Priya Yadav worked together to harass you?" "No."); *id.* 586:9–25 ("Did Tony Ruiz and Bessie Aguilon work together to harass you?" ". . . No."); *id.* 587:9–23, 588:12–14.

The Court rejects Plaintiff's argument that the Court should ignore Plaintiff's deposition testimony because it required Plaintiff to draw a legal conclusion. *See* Opp'n at 20. However, Plaintiff was not asked to draw a legal conclusion, instead Plaintiff was asked why she thought a particular individual acted in a way Plaintiff found objectionable. *See, e.g.*, Rabara Dep. Vol. I at

20

114:8–14; Rabara Dep. Vol. II at 243:20–244:10.

Finally, the case that Plaintiff cites for the proposition that an employer may be liable for failing to remedy or prevent a hostile work environment, *Birschtein v. New United Motor Mfg.*, 92 Cal. App. 4th 994 (Cal. Ct. App. 2011), is inapposite. Opp'n at 19–20. In that case, the California Court of Appeal found the continuing violation doctrine applied because the plaintiff was subject to sexual harassment, including a "staring campaign" by a *single individual* who *continuously* engaged in the misconduct both inside and outside the limitations period. 92 Cal. App. 4th at 1006. All of the misconduct had a similar character of sexual aggression toward the female plaintiff. *See id.* By contrast, the Plaintiff in the instant case alleges isolated incidents over a period of more than five years involving over seventeen different individuals who engaged in varied and unrelated conduct with no common motivation or purpose. Plaintiff admitted these individuals were not acting in concert. Plaintiff also admitted that some of these individuals were motivated by stress and fatigue.

Accordingly, the Court finds the acts are not sufficiently similar in kind. Therefore, the continuing violations doctrine is not applicable to save Plaintiff's claims. *See, e.g.*, *Morgan*, 88 Cal. App. 4th at 65–67 (finding the continuing violation doctrine inapplicable after determining that the discriminatory acts were not sufficiently similar in kind because they were a series of "isolated or sporadic acts").

### c. Frequency

Because Plaintiff fails to satisfy the first prong of the continuing violation doctrine—similarity, the Court need not reach the second prong—frequency. Nonetheless, the Court finds Plaintiff fails to satisfy the frequency prong.

The only case Plaintiff cites to support a finding of frequency, *Birschtein*, 92 Cal. App. 4th 994 (Cal. Ct. App. 2011), is inapposite. Opp'n at 20–21. In that case, the plaintiff's co-worker, for the first six months of the incidents, would go to plaintiff's work station five to ten times a day and stare at the plaintiff. 92 Cal. App. 4th at 998. After the plaintiff complained, the staring incidents went down, but still occurred two to three times a day. *Id.* Nonetheless, there were some

United States District Court
Northern District of California

several month gaps in the co-worker's staring misconduct. *Id.* at 1006. However, the California Court of Appeal found that those gaps were due to plaintiff's "lengthy absence from work for several months" and further found that, apart from plaintiff's leave of absence from work, the wrongdoer's conduct was otherwise continuous. *See id.* The California Court of Appeal concluded, "[f]or all the record shows, apart from these hiatuses, [defendant's] conduct was continuous; it was thus sufficient to meet the frequency requirement of the *Richard*'s formulation, at least for summary judgment purposes." *Id.*

By contrast to the wrongdoer's conduct in *Birschtein*, the conduct of Plaintiff's alleged wrongdoers is not nearly as pervasive as the *Birschtein* wrongdoer, who stared at plaintiff *several times a day* during the relevant time period. Defendant requests that the Court consider only Plaintiff's allegations regarding her eye disability in conducting the frequency analysis. Mot. at 15. Plaintiff does not oppose Defendant's request. Opp'n at 21. Here, Plaintiff alleges that her wrongdoers engaged in discriminatory conduct related to her eye in six instances between 2009 to 2012: summer of 2009, June 2010, June 2011, October 2011, "late" 2011, and throughout 2012. *See* Amend. Compl. ¶¶ 19, 37, 52, 53–54, 57, 60; Mot. at 15. Even if the Court excuses the period when Plaintiff took a leave of absence from June 7, 2010 to December 2, 2010,[3] Plaintiff has still failed to show that this conduct was otherwise "continuous." *See, e.g.*, *Murdock v. Cty. of Fresno*, No. CV F 09-0547 LJO SMS, 2010 WL 4806916, at *9 (E.D. Cal. Nov. 18, 2010) (finding no frequency and calling plaintiff's discrimination claims "sporadic" and "infrequent" when the discriminatory acts prior to the statute of limitations date included three acts in 2002, one act in 2004, two acts in 2005, and one act in 2006).

Moreover, even if the Court considers all of Plaintiff's allegations regarding her wrongdoer's conduct, the Court still finds no frequency because of the gaps in time and the lack of related conduct or common purpose of the alleged conduct. In *Birchstein*, the wrongdoer was a

---

[3] Plaintiff's other two leaves of absence, from September 6, 2013 through March 15, 2014 and from April 30, 2014 through Plaintiff's termination on December 10, 2014, occurred after the alleged conduct related to Plaintiff's eye.

single individual who engaged in related conduct—a "staring campaign"—directed at the plaintiff. By contrast, the instant Plaintiff's wrongdoers consist of seventeen different individuals who engaged in varied and unrelated conduct with no common motivation or purpose over a period of more than five years. For instance, Plaintiff first alleges unrelated conduct by her subordinates and a comment by Assistant Director of Nursing Milagros Rea about Plaintiff's eye that occurred in the spring and summer of 2009. The next conduct did not occur until fall 2009, when nurse Jessie Bongato called Plaintiff a complainer. That conduct is followed by a several month gap until December 2009, when a nurse named "Joy" refused to help Plaintiff. Then there are six more months between the December 2009 conduct and the next alleged conduct in June 2010, when Staff Development Manager Chan told two other co-workers that Plaintiff "was partially blind, and, therefore, prone to mistakes." The Court need not repeat all of Plaintiff's allegations (detailed in Section III.B.1.a.) because they all follow this sporadic and unrelated pattern. *See* Amend. Compl. ¶¶ 11–16, 19, 22, 24–25, 45–47, 52–54, 58, 61, 70–71, 88–90, 91–98, 106, 108.

Finally, several courts have noted that misconduct is not frequent when there are six month gaps or longer in the misconduct. *See, e.g.*, *Brennan v. Townsend & O'Leary Enterprises, Inc.*, 199 Cal. App. 4th 1336 at 1354 n.4 (Cal. Ct. App. 2011) ("[W]e cannot see how the incidents of wrongful conduct relied upon by plaintiff in this action can be considered as continuing with reasonable frequency when the incidents are spaced apart no less than six months and sometimes more than a year."); *Adetuyi v. City & Cty. of San Francisco*, No. A124936, 2011 WL 1878853, at *7 (Cal. Ct. App. May 17, 2011) ("We agree with the trial court that wrongful conduct cannot be considered 'continuing' or 'reasonably frequent' when no memorable incident occurred for the space of an entire year. If the level of sexual or retaliatory harassment falls to a level so minimal that it results in no memorable events for an entire year, it has effectively ceased."). Here, there are multiple gaps between the alleged wrongdoers' conduct, and some of the gaps are at least six months.

In sum, the Court finds that Plaintiff's FEHA claims that are predicated on conduct before March 12, 2014, are time barred and that the continuing violations doctrine does not apply.

23

Accordingly, the Court GRANTS Defendant summary judgment on Plaintiff's FEHA claims that are predicated on conduct before March 12, 2014. In the sections that follow, the Court considers Plaintiff's disability discrimination; failure to accommodate; failure to engage in the interactive process; hostile work environment harassment; retaliation; and failure to prevent harassment, discrimination, or retaliation claims to the extent those claims are based on post March 12, 2014 conduct. Cal. Gov. Code § 12940(a), (m), (n), (j), (h), (k).

### 2. Claim #2: Disability Discrimination in Violation of the FEHA, Cal. Gov. Code § 12940(a)

Defendant argues that Defendant is entitled to summary judgment on Plaintiff's second claim for disability discrimination in violation of the FEHA, Cal. Gov. Code § 12940(a). Mot. at 16–18.

The FEHA provides that it is an unlawful employment practice "for an employer, because of the . . . [physical disability] . . . of any person, to . . . discriminate against the person in . . . terms, conditions, or privileges of employment." Cal. Gov. Code, § 12940(a). In order to prevail on a discriminatory discharge claim under section 12940(a) of the FEHA, "an employee bears the burden of showing (1) that he or she was discharged because of a disability, and (2) that he or she could perform the essential functions of the job with or without accommodation." *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 962 (Cal. Ct. App. 2008) (citing *Green v. State of California*, 42 Cal. 4th 254, 262 (2007)).

Defendant argues that Plaintiff's disability discrimination claim fails because there are no triable issues of material fact as to the question of whether Plaintiff could no longer perform the essential functions of her job. Mot. at 16–18. Defendant argues this is so because the undisputed facts show that Plaintiff could not perform her job—and has not been able to perform any job— since April 2014. *Id.* Defendant also argues that even if Plaintiff could perform the essential functions of her job, Plaintiff cannot demonstrate that the reasons provided for her termination were pretextual. *Id.* The Court agrees with Defendant that Plaintiff's disability discrimination claim is foreclosed because the record reflects that Plaintiff could not perform the essential

functions of her job. Accordingly, the Court need not address the argument about pretext.

Courts have held that when an employee cannot presently perform the essential functions of a job, employers are only required to give an accommodation that is reasonable. However, a "[r]easonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected." *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 226 (1999) ("[A] finite leave can be a reasonable accommodation under FEHA, provided it is likely that at the end of the leave, the employee would be able to perform his or her duties."). In *Hanson*, for instance, the employee was given a sixteen month leave of absence, which was seven months longer than to what he was entitled under the applicable collective bargaining agreement. *Id.* The court found that an additional seven months of leave was a sufficient reasonable accommodation, and that no further accommodation was required thereafter. *Id.* at 227, 228; *see also, e.g.*, *Markowitz v. United Parcel Serv., Inc.*, No. SACV151367AGDFMX, 2016 WL 3598728, at *7 (C.D. Cal. July 1, 2016) ("At the time [plaintiff] was terminated, there was no sign that it was any more 'likely that at the end of the leave, [she] would be able to perform . . . her duties' than it was when the leave began."), *aff'd*, 711 F. App'x 430, 431 (9th Cir. 2018) ("Employers are not required to provide indefinite leaves of absence."). The California Code of Regulations similarly provides:

> When the employee cannot presently perform the essential functions of the job, or otherwise needs time away from the job for treatment and recovery, holding a job open for an employee on a leave of absence or extending a leave provided by the CFRA, the FMLA, other leave laws, or an employer's leave plan may be a reasonable accommodation *provided that the leave is likely to be effective in allowing the employee to return to work at the end of the leave*, with or without further reasonable accommodation, and does not create an undue hardship for the employer. . . . *An employer, however, is not required to provide an indefinite leave of absence as a reasonable accommodation.*

Cal. Code Regs. tit. 2, § 11068(c) (emphasis added).

Here, the undisputed facts show that Plaintiff took three leaves of absence during the course of her employment and that Plaintiff received 19 out of 20 requested extensions. *See*

Case No. 17-CV-03770-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

Marangi Decl. ¶¶ 7–10; First Leave of Absence Forms; Second Leave of Absence Forms; Third Leave of Absence Forms. In particular, Plaintiff's first leave of absence and eight extensions spanned from June 7, 2010 to December 1, 2010. *See* First Leave of Absence Forms. Plaintiff's second leave of absence and eight extensions spanned from September 6, 2013 to March 15, 2014. *See* Marangi Decl. ¶ 9; Second Leave of Absence Forms. Finally, Plaintiff's third leave of absence began on April 30, 2014, and Plaintiff requested and received three follow-up extensions. *See* Marangi Decl. ¶ 10; Third Leave of Absence Forms. When Plaintiff filed her fourth request on November 22, 2014 that sought an extension from December 1, 2014 to April 1, 2015, the doctor's note stated that Plaintiff was "unable to return to work" and is seeing "physical therapy, eye specialists" and therefore, Plaintiff's next "anticipated release back to work is 4/1/2015." Third Leave of Absence Forms. Because Plaintiff's three leaves of absence and 20 requests for extensions (19 of which were granted), spanned almost 19 months, including 14 months of leave within Plaintiff's last 16 months of employment, Defendant determined that it could no longer treat any single request for an excused absence from Plaintiff as a request for definite leave. Marangi Decl. ¶ 12 ("Because of extension after extension, [Plaintiff's] leave appeared indefinite, and we did not feel with any measure of reasonable certainty that [Plaintiff] would actually return on or even near the date indicated on her doctor's note, if at all."). In addition, Plaintiff's doctor, Dr. Saephanh, testified that the final April 1, 2015 return date request in the note was actually aspirational, not an actual expected return to work based on any medical opinion. *See* Hong Decl., ¶ 10, Exhibit J ("Saephanh Dep.") at 69:9–73:23. Specifically, Dr. Saephanh testified that she added the April 2015 return to work date simply because "with any time off work [request], you can't just say forever." *Id.* at 70:23. These undisputed facts support the finding that Plaintiff's leave was indefinite. *See Hanson*, 74 Cal. App. 4th at 226 ("Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.").

Plaintiff's claim that she could perform the essential functions of her job and that further leave would have been a reasonable accommodation is unpersuasive. Opp'n at 22–23. Plaintiff does not cite to evidence in the record indicating that she could have returned to work in April

2015, or ever, for that matter. Plaintiff's "bald, uncorroborated, and conclusory assertion[s] rather than evidence" cannot create a triable issue of fact for the jury. *Arevalo v. Hyatt Corp.*, No. CV 12-7054 JGB VBKX, 2013 WL 2042555, at *8 (C.D. Cal. May 13, 2013) ("The Court finds that Plaintiff's testimony that she could perform the essential duties of her position with a cane is a 'bald, uncorroborated, and conclusory assertion[ ] rather than evidence,' and the Court finds that it does not create a triable issue of material fact that requires consideration by the jury." (citing *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010)). Similarly, although Plaintiff asserts that Defendant should have called her to confirm the length of her leave and confirm whether Plaintiff could return to work, Opp'n at 23, this argument does not provide evidence that Plaintiff could have performed the essential duties of her positions with a reasonable accommodation. Moreover, Plaintiff's unsupported assertions are directly contradicted by evidence in the record demonstrating that Plaintiff has not looked for a job or worked a single day since she was terminated in 2014. *See* Rabara Dep. Vol. I at 20:1–21:13 ("So you have not looked for a job since December 2014; is that correct?" "No. I was on disability."); Rabara Dep. Vol. III at 211:19–213:1; *see Markowitz*, 2016 WL 3598728, at *7 ("It's worth repeating that to this day, Markowitz doesn't appear to have presented any medical evidence showing that she can return to work."). Plaintiff has presented no evidence that she was capable of performing the essential functions of her job. Plaintiff has presented no evidence that she could return to work any day since her December 2014 termination, more than four years ago. The undisputed facts in the record demonstrate that Plaintiff's final leave request was in fact indefinite, and therefore she could not have performed the essential functions of her job.

In sum, the Court finds that Plaintiff has demonstrated no genuine factual dispute as to whether she could perform the essential functions of her job. Accordingly, Plaintiff is unable to establish disability discrimination under the FEHA. Therefore, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's claim for disability discrimination in violation of the FEHA, Cal. Gov. Code § 12940(a).

27

### 3. Claim #3: Failure to Accommodate in Violation of the FEHA, Cal. Gov. Code § 12940(m)

Defendant next argues that Defendant is entitled to summary judgment on Plaintiff's third claim for failure to provide reasonable accommodation in violation of the FEHA, Cal. Gov. Code § 12940(m). Mot. at 18–20.

The FEHA makes it an unlawful employment practice "[f]or an employer . . . to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Cal. Gov't Code § 12940(m). The essential elements of a failure to accommodate claim are: (1) the plaintiff suffers from a disability covered by the FEHA; (2) the plaintiff is a qualified individual, which a plaintiff proves by establishing that she can perform the essential functions of the position; and (3) the defendant failed to reasonably accommodate the plaintiff's disability. *Wilson v. County of Orange*, 169 Cal. App. 4th 1185, 1192 (Cal. Ct. App. 2009) (citing *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 256 (Cal. Ct. App. 2000)). An employer who knows of the disability of an employee has "an affirmative duty" to make reasonable accommodations for that employee's disability "unless the employer can demonstrate that doing so would impose an 'undue hardship.'" *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 950–51 (1997). Nevertheless, "[a]n employee cannot demand clairvoyance of his employer." *King v. United Parcel Serv., Inc.*, 152 Cal. App. 4th 426, 443 (2007).

In the instant case, Plaintiff effectively argues that Defendant should have made two different accommodations. First, Plaintiff argues that Plaintiff "made countless requests for reasonable accommodations for her disability throughout her five years of employment," Opp'n at 25–26, which necessarily includes Plaintiff's three requests for leave of absence and 20 requests for extensions. Plaintiff's second theory is that Defendant failed to accommodate Plaintiff with four-day work weeks. *See id.* The Court considers both accommodation arguments.

#### a. Leave Requests

First, as to the leave requests, the undisputed evidence shows that Defendant granted Plaintiff all three of her requests for leave of absence as well as 19 of Plaintiff's 20 requests for

extensions.[4] Defendant denied Plaintiff's twentieth and final extension request, when Plaintiff's employment was terminated in December of 2014. *See* Marangi Decl. ¶¶ 7–10; First Leave of Absence Forms; Second Leave of Absence Forms; Third Leave of Absence Forms. Therefore, for Plaintiff's three leave requests and nineteen extensions, there is no fact issue that Defendant provided Plaintiff with an accommodation. *See Jensen*, 85 Cal. App. 4th at 256 (explaining that the essential elements of a failure to accommodate claim include that the defendant failed to reasonably accommodate the plaintiff's disability).

As for the final extension request and Plaintiff's December 2014 termination, the Court finds that Plaintiff has not shown a genuine factual dispute as to whether she was a qualified individual, which a plaintiff proves by establishing that she can perform the essential functions of the position. *Jensen*, 85 Cal. App. 4th at 256. Moreover, indefinite leave is not a reasonable accommodation. *See Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th at 226 ("Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected."); Cal. Code Regs. tit. 2, § 11068(c).

The undisputed facts show that the November 22, 2014 doctor's note for Plaintiff's final extension stated that Plaintiff was "unable to return to work" and is seeing "physical therapy, eye specialists" and therefore, Plaintiff's next "anticipated release back to work is 4/1/2015." Third Leave of Absence Forms. Because of Plaintiff's three leaves of absence and 20 requests for extensions that spanned almost 19 months, including 14 months of Plaintiff's last 16 months of employment, Defendant determined that it could no longer treat any single request for an excused absence from Plaintiff as a request for definite leave. Marangi Decl. ¶ 12 ("Because of extension after extension, [Plaintiff's] leave appeared indefinite, and we did not feel with any measure of reasonable certainty that [Plaintiff] would actually return on or even near the date indicated on her

---

[4] Moreover, Plaintiff's first two leave requests and most of the extensions associated with those requests occurred outside of the March 12, 2014, statute of limitations date. In particular, Plaintiff's first leave of absence and eight extensions spanned from June 7, 2010 to December 1, 2010. *See* First Leave of Absence Forms. Plaintiff's second leave of absence and eight extensions spanned from September 6, 2013 to March 15, 2014. *See* Second Leave of Absence Forms.

Case No. 17-CV-03770-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

doctor's note, if at all."). In addition, Plaintiff's doctor, Dr. Saephanh, testified that the final April 1, 2015 return date request in the note was aspirational, not an actual expected return to work based on any medical opinion. *See* Saephanh Dep. at 69:9–73:23. Specifically, Dr. Saephanh testified that she added the April 2015 return to work date simply because "with any time off work [request], you can't just say forever." *Id.* at 70:23. It is also undisputed that Plaintiff has not looked for a job or worked since she was terminated in 2014. *See* Rabara Dep. Vol. I at 20:1–21:13 ("So you have not looked for a job since December 2014; is that correct?" "No. I was on disability."); *see Markowitz*, 2016 WL 3598728, at *7 ("It's worth repeating that to this day, Markowitz doesn't appear to have presented any medical evidence showing that she can return to work."). Plaintiffs has presented no evidence that she was capable of performing the essential functions of her job. Plaintiff has presented no evidence that she could return to work any day since her December 2014 termination, more than four years ago. The undisputed facts in the record demonstrate that Plaintiff's final leave request was in fact indefinite, and therefore she could not have performed the essential functions of her job.

Plaintiff argues in opposition that there is a genuine dispute of fact as to whether more leave would have been reasonable. Opp'n at 26. In support of this argument, Plaintiff points to the fact that another employee (who is Plaintiff's sister), Belinda Rabara ("Belinda"), was offered a position transfer as an accommodation for Belinda's disability. *See id.*; Ciarimboli Decl., Ex. 30 ("Belinda Letter"); *id.*, Ex. 28 ("Belinda Dep.") at 34:5–12. The Court finds this argument unhelpful and irrelevant to Plaintiff's failure to accommodate claim. Belinda's situation differs from Plaintiff's as Belinda's letter references that Belinda's doctor had provided restrictions that limited Belinda's activities. As such, Defendant proposed two job transfers that "fell within the work restrictions set by [Belinda's] health care provider." *See* Belinda Letter. By contrast, Plaintiff's final extension request provided no such work restrictions limiting Plaintiff's activities and only communicated that that Plaintiff was "unable to return to work" and is seeing "physical therapy, eye specialists" and therefore, Plaintiff's next "anticipated release back to work is 4/1/2015." Third Leave of Absence Forms. In addition, Plaintiff's doctor, Dr. Saephanh, testified

30

that the final April 1, 2015 return date request in the note was actually aspirational, not an actual

expected return to work based on any medical opinion. *See* Saephanh Dep. at 69:9–73:23

Specifically, Dr. Saephanh testified that she added the April 2015 return to work date simply

because "with any time off work [request], you can't just say forever." *Id.* at 70:23. Therefore,

when Defendant received Plaintiff's final extension request, Defendant properly determined that

Plaintiff was effectively asking for indefinite leave. *See Hanson v. Lucky Stores, Inc.*, 74 Cal. App.

4th at 226 ("Reasonable accommodation does not require the employer to wait indefinitely for an

employee's medical condition to be corrected.").

   Accordingly, the Court finds that there is no genuine factual dispute as to Plaintiff's theory

that Defendant failed to accommodate her by providing her with leave.

### b. Four-day Work Weeks

   Second, the Court discusses Plaintiff's theory that Defendant failed to accommodate

Plaintiff by not providing Plaintiff with four-day work weeks.

   As an initial matter, much of Plaintiff's argument relies on incidents that occurred outside

of the statute of limitations period, before March 12, 2014. Indeed, Plaintiff's arguments focus, in

part, on the fact that she requested and received four-day weeks in 2009 but that the

accommodation was revoked in 2011. Opp'n at 25. For the reasons stated above, to the extent

Plaintiff relies on incidents that occurred outside of the statute of limitations period, before March

12, 2014, the Court GRANTS summary judgment. *See* Section III.B.1; *see also* Opp'n at 25–26.

   Plaintiff also points to an incident that began prior to the March 12, 2014 statute of

limitations date, but then continued into the statute of limitations period. Opp'n at 25–26. In

particular, Plaintiff argues that she presented Defendant with a doctor's note on February 19,

2014, that stated that Plaintiff should be limited to a four-day work week schedule, but that

Defendant revoked that schedule in "late April 2014." *Id.* The Court finds that this an incomplete

summary of the facts, and that considering all of the facts, Plaintiff cannot demonstrate a genuine

factual dispute as to whether Defendant failed to reasonably accommodate Plaintiff with four-day

work weeks.

United States District Court
Northern District of California

First, the undisputed facts show that Plaintiff provided a doctor's note prior to the statute of limitations period—on February 19, 2014—stating that Plaintiff should be limited to a four-day work week schedule. Ciarimboli Decl., Ex. 17 ("2/19/14 Doctor's Note"). On March 6, 2014, however, Plaintiff's doctor wrote that Plaintiff "may return to work on 3/7/2014 *without restrictions*." Second Leave of Absence Forms at HES296 (emphasis added). Although Plaintiff's doctor's follow-up letter stated that Plaintiff could work beginning March 7, 2014 without restrictions, the undisputed facts show that Defendant nonetheless accommodated Plaintiff with four-day work weeks into the start of the statute of limitations period, in March and April 2014. *See* Opp'n at 26.

The only instance within the statute of limitations of Defendant's alleged failure to accommodate with four-day work weeks took place on April 25, 2014. On that date, Plaintiff was informed by Aguilon that she would be *scheduled* for five-day work weeks in May and that she should talk to HR if she had concerns about her schedule. Amend. Compl. ¶¶ 89–91. However, Plaintiff presents no evidence that she conferred with Defendant's HR department. Nor does Plaintiff present any evidence that Plaintiff requested another four-day work week accommodation within the statute of limitations period. *See King*, 152 Cal. App. 4th at 443 ("An employee cannot demand clairvoyance of his employer."). Given that the last note from Plaintiff's doctor stated that Plaintiff could work without restrictions and given that Plaintiff never asked for a new accommodation, Defendant did not fail to provide an accommodation.

Moreover, the undisputed facts show that even though Plaintiff was told that she would be "scheduled" for five-day work weeks in May, Plaintiff never actually worked any five-day work weeks. Defendant's time records reflect that Plaintiff returned to work from her second leave on March 15, 2014 and worked four-day work weeks or less through April 30, 2014. *See* Time Sheets. On April 30, 2014, Plaintiff then went on her third and final leave of absence. Therefore, Plaintiff never actually worked five-day work weeks within the statute of limitations period. Thus, Plaintiff has not demonstrated a genuine fact issue on her failure to accommodate claim.

Accordingly, the Court GRANTS Defendant's motion for summary judgment on

Plaintiff's claim for failure to accommodate in violation of the FEHA, Cal. Gov. Code § 12940(m).

### 4. Claim #4: Failure to Engage in Interactive Process in Violation of the FEHA, Cal. Gov. Code § 12940(n)

Defendant next argues that Defendant is entitled to summary judgment on Plaintiff's fourth claim for failure to engage in the interactive process as required by the FEHA, Cal. Gov. Code § 12940(n). For the reasons given below, the Court agrees.

The FEHA makes it unlawful "[f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n). So long as the employee is disabled and qualified to perform his job duties, the employer has an affirmative duty "to explore further methods of accommodation before terminating [the employee]." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). However, "an employer may be held liable for failing to engage in the good faith interactive process only if a reasonable accommodation was available." *Nadaf–Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal.App.4th 952, 979–81 (Cal. Ct. App. 2008). The good faith interactive process requires that "both sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." *Id.* at 984–85 (alterations omitted). "[T]he trial court's ultimate obligation is to isolate the cause of the breakdown [in the interactive process] and then assign responsibility," so the employer may be liable only if the employer is responsible for the breakdown of the interactive process. *Id.* at 985 (alterations omitted).

In the instant case, the undisputed evidence shows that Defendant did engage in the interactive process with Plaintiff. Marangi Decl. ¶ 10; Third Leave of Absence Forms. Specifically, within the relevant statute of limitations period (not to mention the instances that Defendant engaged in the interactive process with Plaintiff throughout the course of her

employment), Defendant granted Plaintiff's third leave of absence beginning on April 30, 2014 and granted Plaintiff her three follow-up requested extensions. Marangi Decl. ¶ 10; Third Leave of Absence Forms.

Plaintiff's failure to engage in the interactive process claim therefore hinges on Plaintiff's final leave extension request and December 2014 termination. Plaintiff's final leave extension request and termination in December 2014, however, cannot support Plaintiff's failure to engage in the interactive process claim because the law is clear that "an employer may be held liable for failing to engage in the good faith interactive process only if a *reasonable accommodation* was available." *Nadaf–Rahrov*, 166 Cal. App. 4th at 979–81 (emphasis added).

As the Court discussed above, indefinite leave is not a reasonable accommodation. *See Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th at 226 ("Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected."); Cal. Code Regs. tit. 2, § 11068(c). Here, Plaintiff's November 22, 2014 doctor's note for Plaintiff's final extension stated that Plaintiff was "unable to return to work" and is seeing "physical therapy, eye specialists" and therefore, Plaintiff's next "anticipated release back to work is 4/1/2015." Third Leave of Absence Forms. Because of Plaintiff's three leaves of absence and 20 requests for extensions that spanned almost 19 months, including 14 months of Plaintiff's last 16 months of employment, Defendant determined that it could no longer treat any single request for an excused absence from Plaintiff as a request for definite leave. Marangi Decl. ¶ 12 ("Because of extension after extension, [Plaintiff's] leave appeared indefinite, and we did not feel with any measure of reasonable certainty that [Plaintiff] would actually return on or even near the date indicated on her doctor's note, if at all."). In addition, Plaintiff's doctor, Dr. Saephanh, confirmed that the final April 1, 2015 return date request in the note was aspirational, not an actual expected return to work based on any medical opinion. *See* Saephanh Dep. at 69:9–73:23. Specifically, Dr. Saephanh testified that she added the April 2015 return to work date simply because "with any time off work [request], you can't just say forever." *Id.* at 70:23. It is also undisputed that Plaintiff has not looked for a job or worked since her December 2014 termination. *See* Rabara Dep. Vol. I

34

at 20:1–21:13 ("So you have not looked for a job since December 2014; is that correct?" "No. I was on disability."); *see Markowitz*, 2016 WL 3598728, at *7 ("It's worth repeating that to this day, Markowitz doesn't appear to have presented any medical evidence showing that she can return to work."). Plaintiff has presented no evidence that she was capable of performing the essential functions of her job. Plaintiff has presented no evidence that she could return to work any day since her December 2014 termination, more than four years ago. The undisputed facts in the record demonstrate that Plaintiff's final leave request was in fact indefinite. Because indefinite leave is not a reasonable accommodation, Defendant cannot be held liable for failing to engage in the interactive process. *See Nadaf–Rahrov*, 166 Cal. App. 4th at 979 ("[A]n employer may be held liable for failing to engage in the good faith interactive process only if a *reasonable accommodation* was available.").

Therefore, the Court GRANTS summary judgment for Defendant on Plaintiff's claim for failure to engage in the interactive process in violation of the FEHA, Cal. Gov. Code § 12940(n).

### 5. Claim #6: Hostile Work Environment Harassment in Violation of the FEHA, Cal. Gov. Code § 12940(j)

Defendant next argues that Defendant is entitled to summary judgment on Plaintiff's sixth claim for hostile work environment harassment in violation of the FEHA, Cal. Gov. Code § 12940(j). Mot. at 20–21. Plaintiff does not specifically respond to Defendant's arguments regarding Plaintiff's hostile work environment harassment claim. *See* Opp'n.

The FEHA makes it unlawful for an employer, because of a physical disability or a mental disability, to harass an employee. Cal. Gov. Code § 12940(j). The elements of a claim of hostile environment harassment based on disability under the FEHA are: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment because of being a member of that group; and (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *See Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal. 4th 121, 130 (1999). "[H]arassment consists of a type of conduct not necessary for performance of a supervisory job." *Janken v. GM Hughes Electronics*, 46 Cal. App.

4th 55, 63 (Cal. Ct. App. 1996). In general, "commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment." *See Reno v. Baird*, 18 Cal. 4th 640, 646–47 (1998). "These are actions of a type necessary to carry out the duties of business and personnel management." *Reno*, 18 Cal. 4th at 647.

Plaintiff's harassment allegations within the statute of limitations period consist of allegations against Yadav (the HR Director) and Aguilon (the scheduler). Specifically, Plaintiff's allegations after the March 12, 2014 statute of limitations date consist of the following: (1) around April 9, 2014, Plaintiff called in sick; however, the scheduler Aguilon told Plaintiff that there were only six nurses scheduled, when in fact the schedule said there were eight, and as a result, Plaintiff was forced to work when she was sick; (2) Aguilon scheduled Plaintiff for five-day work weeks starting in May 2014; (3) on June 6, 2014, Plaintiff "expressed her concerns about Aguilon and Jacinto's close friendship impacting nurses' schedules" and Plaintiff's belief "that duties and schedules were consistently manipulated based upon favoritism" to Administrator Dechert; (4) on November 26, 2014, Yadav left Plaintiff a voicemail saying that Plaintiff's employment and benefits would end on December 16, 2014; and (5) on December 10, 2014, Plaintiff was terminated. Amend. Compl. ¶¶ 88–90, 91–98, 106, 108.

As an initial matter, the Court notes that Plaintiff's second allegation is only that she was informed by Aguilon that she would be *scheduled* for five-day work weeks in May 2014. Amend. Compl. ¶¶ 89–91. However, the undisputed facts show that Plaintiff never actually worked any five-day work weeks in May 2014. In fact, Plaintiff never worked after April 2014. Defendant's time records reflect that Plaintiff returned to work from her second leave of absence on March 15, 2014 and worked four-day work weeks or less through April 30, 2014. *See* Time Sheets. On April 30, 2014, Plaintiff then went on her third and final leave of absence. Therefore, Plaintiff never actually worked five-day work weeks in May 2014.

United States District Court
Northern District of California

36

Moreover, the record also shows that Plaintiff had no four-day work week restriction at the time that Aguilon scheduled Plaintiff for five-day work weeks. Indeed, Plaintiff provided a doctor's note prior to the statute of limitations period—on February 19, 2014—stating that Plaintiff should be limited to a four-day work week schedule. *See* 2/19/14 Doctor's Note. On March 6, 2014, however, Plaintiff's doctor wrote that Plaintiff "may return to work on 3/7/2014 *without restrictions*." Second Leave of Absence Forms at HES296 (emphasis added). Plaintiff does not present any evidence that Plaintiff requested another four-day work week accommodation after the doctor's note revoked the restriction.

Defendant argues that Defendant is entitled to summary judgment on Plaintiff's hostile work environment harassment claim, the FEHA, Cal. Gov. Code § 12940(j) for two reasons. First, Defendant argues that Yadav and Aguilon acted within the capacity of their positions as HR Director and scheduler, and therefore, their conduct was not harassment. *See* Mot. at 20; *See Janken*, 46 Cal. App. 4th at 63 ("[H]arassment consists of a type of conduct not necessary for performance of a supervisory job."). Second, Defendant argues that Yadav and Aguilon's actions were not pervasive enough. Mot. at 21; *see Aguilar*, 21 Cal. 4th at 130 (explaining that to succeed on a hostile work environment claim, the harassment needs to be sufficiently severe or pervasive enough to alter the conditions of employment and create an abusive working environment). The Court explores both arguments below.

First, the Court agrees with Defendant that Defendant is entitled to summary judgment because Plaintiff's allegations against both Yadav and Aguilon are based on their actions squarely within their capacity as HR Director and scheduler. As HR Director, Yadav's actions of calling Plaintiff to inform her that her employment and benefits would be ending fall within her duties as HR Director. *See* Job Descriptions; *see Reno*, 18 Cal. 4th at 646–47 ("[C]ommonly necessary personnel management actions such as hiring and firing, . . . deciding who will be laid off, and the like, do not come within the meaning of harassment."). Similarly, for Aguilon, as the scheduler, scheduling Plaintiff was necessarily part of Aguilon's job. This action is of a type "necessary to carry out the duties of business and personnel management." *Id.* at 647.

Second, even if Yadav and Aguilon's duties were outside the scope of their duties, the Court agrees with Defendant that the incidents that Plaintiff alleged within the statute of limitations are not severe or pervasive enough to create a hostile work environment. *See Aguilar*, 21 Cal. 4th at 130 (explaining that harassment needs to be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment); *Lyle v. Warner Brothers Television Productions*, 38 Cal. 4th 264, 284 (2006) ("With respect to the pervasiveness of harassment, courts have held an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature.").

Accordingly, the Court GRANTS summary judgment for Defendant on Plaintiff's claim for hostile work environment harassment in violation of the FEHA, Cal. Gov. Code § 12940(j).

### 6. Claims #5 and #8: Retaliation in Violation of the FEHA, Cal. Gov. Code § 12940(h) and Adverse Employment Action in Violation of Public Policy

Defendant next argues that Defendant is entitled to summary judgment on Plaintiff's fifth claim for retaliation in violation of the FEHA, Cal. Gov. Code § 12940(h), and eighth claim for an adverse employment action in violation of public policy. Mot. at iii, 20–21. A plaintiff claiming retaliation must establish a prima facie case by showing that: (1) she engaged in a protected activity; (2) the defendant subjected her to an adverse employment action; and (3) there was a causal link between the two. *See Scotch v. Art Institute of Cal.*, 173 Cal. App. 4th 986, 1020 (2009).

Here, Plaintiff's alleged protected activity consisted of her last two complaints. The first complaint was Plaintiff's complaint to Jacinto on March 6, 2014 (prior to the statute of limitations period) about Plaintiff's four-day work week request and about Yadav, the HR Director. The second complaint was Plaintiff's June 6, 2014 complaint to Administrator Dechert, who was Plaintiff's friend and "protector," about Yadav, Jacinto, and Aguilon. Amend. Compl. ¶¶ 79–81; 97–99, 104. The adverse employment action consists of Defendant's termination of Plaintiff in December 2014. Defendant challenges Plaintiff's retaliation claim with respect to causation by

arguing that there is no causal link between Plaintiff's protected activity (i.e., the complaints) and Plaintiff's termination in December 2014. Mot. at 21–22. For the reasons below, the Court agrees with Defendant that there is no causal link between Plaintiff's complaints and Plaintiff's termination.

First, there is evidence in the record that after Plaintiff made her two complaints, Defendant did not take adverse employment action and instead Defendant provided Plaintiff with further accommodations. As an initial matter, Plaintiff admits that after Plaintiff complained to Jacinto on March 6, 2014, Jacinto helped Plaintiff ensure her four-day workweek accommodation for March and April of 2014. *See* Amend Compl. ¶ 84; Rabara Dep. Vol. III at 484:23–485:8. After the June 6, 2014 complaint, the evidence shows that Defendant provided Plaintiff with two more extensions of her third leave of absence on June 27, 2014 and August 20, 2014. *See* Marangi Decl. ¶ 10; Third Leave of Absence Forms. Moreover, the evidence shows that the June 6, 2014 complaint to Dechert was not even made to Defendant. Plaintiff stated that Dechert was a friend and a "protector." Plaintiff presents no evidence that Defendant even knew about Plaintiff's complaint to Dechert. Amend. Compl. ¶¶ 97–99, 104.

Second, the Court agrees with Defendant that the timing of Plaintiff's termination, on December 10, 2014, is further evidence of the lack of a causal connection between Plaintiff's complaints on March 6, 2014 and June 6, 2014, and the termination. *See* Mot. at 22. First, nine months passed between Plaintiff's earlier March 6, 2014 complaint to Jacinto and Plaintiff's December 10, 2014 termination. More than seven months passed between Plaintiff's June 6, 2014 complaint to Dechert and Plaintiff's December 10, 2014 termination. Courts have found that similar gaps in time between the protected activity and the adverse employment action foreclose a finding of causation. *See, e.g., Manat v. Bank of Am.*, 339 F.3d 792, 802 (9th Cir. 2003) (finding no evidence from which a jury might infer causation because "approximately nine months lapsed between the date of [plaintiff's] complaint and [defendant's] alleged adverse decisions"); *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam) (noting that a court may not infer causation from temporal proximity unless the time between an employer's knowledge of protected

activity and an adverse employment action is "very close" and citing cases for the proposition that a three-month and four-month time lapse is insufficient to infer causation); s*ee also Duarte v. Vons Cos.*, 2015 Cal. App. Unpub. LEXIS 7401, *1298 (Cal. Ct. App. Oct. 14, 2015) ("Duarte filed his workers' compensation claim at least by April, 2010 and he was terminated in December 2010. This time discrepancy is not sufficient to show the necessary causal connection.").

Accordingly, the Court finds no genuine factual dispute as to the casual link. Therefore, the Court GRANTS summary judgment for Defendant on Plaintiff's claim for retaliation in violation of the FEHA, Cal. Gov. Code § 12940(h), and on Plaintiff's adverse employment action in violation of public policy claim.

### 7. Claim #7: Failure to Prevent Harassment, Discrimination, or Retaliation in Violation of the FEHA, Cal. Gov. Code § 12940(k)

Defendant argues that Defendant is entitled to summary judgment on Plaintiff's seventh claim for failure to prevent harassment, discrimination, or retaliation ("failure to prevent") in violation of the FEHA, Cal. Gov. Code § 12940(k) because this claim is derivative of Plaintiff's second through sixth claims. Mot. at iii. Plaintiff provides no opposition to Defendant's argument that her failure to prevent claim is entirely derivative of her other FEHA claims. *See* Opp'n.

Because Plaintiff's failure to prevent claim is derivative of Plaintiff's other FEHA claims on which the Court grants summary judgment, the derivative failure to prevent claim also fails. *See Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 288–89 (Cal. Ct. App. 1998) ("There's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen."); *Featherstone v. S. California Permanente Med. Grp.*, 10 Cal. App. 5th 1150, 1166 (Cal. Ct. App. 2017) ("Because Featherstone cannot establish her underlying cause of action for disability discrimination, she cannot maintain a derivative claim for violation of section 12940, subdivision (k)."), *review denied* (July 12, 2017).

Accordingly, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's derivative claim for failure to prevent in violation of the FEHA, Cal. Gov. Code § 12940(k).

### C. Claim #9: Violation of Labor Code §§ 98.6 & 1102.5

Defendant moves for summary judgment on Plaintiff's ninth claim, which asserts a right to recover for violations of California Labor Code §§ 98.6 & 1102.5. Mot. at 25–26.

Known commonly as California's whistleblower statute, California Labor Code § 1102.5(b) provides "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance."

California Labor Code § 98.6 provides that an employer "shall not discharge an employee . . . because the employee . . . has filed a bona fide complaint or claim or instituted or caused to be instituted any proceeding under or relating to his or her rights that are under the jurisdiction of the Labor Commissioner."

To establish a prima facie case for retaliation under either Labor Code section, an employee must show "(1) that [s]he engaged in protected activity, (2) that [s]he was thereafter subjected to an adverse employment action by [her] employer, and (3) that there was a causal link between the protected activity and the adverse employment action." *Love v. Motion Indus., Inc.*, 309 F. Supp. 2d 1128, 1134 (N.D. Cal. 2004) (citing *Morgan*, 88 Cal. App. 4th at 69).

Plaintiff identifies facts in her opposition—without providing any citation to evidence supporting those facts—that she made complaints in 2009 regarding patients' medications not being properly distributed and that patients' call buttons were being hidden from them, as well as other complaints about patients' dietary needs and forcing nurses to work off the clock. Plaintiff also states she made a complaint in 2010 that Defendant failed to investigate a patient's husband's abusive conduct. Opp'n at 29; Amend Compl. ¶¶ 16–35; Rabara Dep. Vol. I at 126:3–128:13.

41

Plaintiff then states in her opposition, again without citation or support, that as early as May 2009, Defendant retaliated through various conduct, resulting in Plaintiff's eventual termination in December 2014. Opp'n at 29.

Defendant argues that the Court should grant summary judgment for two reasons. First, Defendant argues that Plaintiff's claims that rely on conduct prior to October 26, 2013 are time barred. Second, Defendant argues that Plaintiff has provided no evidence demonstrating a causal link between any of her complaints and Plaintiff's December 2014 termination, which would constitute the only adverse employment action within the statute of limitations period. Mot. at 25–26; Reply at 9. The Court agrees.

First, California's statute of limitations for "[a]n action upon a liability created by statute, other than a penalty or forfeiture" is three years. Cal. Civ. Proc. Code § 338(a). Therefore, Plaintiff's Labor Code §§ 1105.2 and 98.6 violation claims are subject to a three-year statute of limitations. *See, e.g.*, *Minor v. Fedex Office & Print Servs, Inc.*, 182 F. Supp. 3d 966, 988 (N.D. Cal. 2016) ("[A]ctions commenced under § 1102.5 must be brought within three years."); *Monk v. Sacramento Metro. Fire Dist.*, 2011 WL 6176078, at *11 (Cal. Ct. App. Dec. 13, 2011) (unpublished) (dismissing § 1102.5 claim as time barred under three-year statute of limitations set forth in Cal. Civ. Proc. Code § 338(a)).

Plaintiff filed her complaint in the instant lawsuit on October 26, 2016. Therefore, the conduct must have occurred within three years of that date, i.e., after October 26, 2013, to fall within the statute of limitations. Here, Plaintiff does not dispute that her alleged complaints supporting her claim took place in 2009 and 2010. Further, Plaintiff provides no argument or evidence that any of the adverse employment actions, (with the exception of her December 2014 termination), occurred within the statute of limitations. *See* Opp'n at 29. Therefore, to the extent Plaintiff's claim relies on adverse employment actions before October 26, 2013, it is time-barred.

Second, the only adverse employment action that Plaintiff cites within the statute of limitations period is Plaintiff's December 2014 termination. Opp'n at 29. However, Plaintiff has provided no evidence demonstrating a genuine dispute of material fact that Plaintiff's December

42

2014 termination was motivated by her 2009 and 2010 complaints. Plaintiff's December 2014 termination took place four to five years after Plaintiff's complaints. Courts have found that shorter gaps between the protected activity and the adverse employment action foreclosed a finding of causation. *See, e.g., Manat*, 339 F.3d at 802 (finding no evidence from which a jury might infer causation because "approximately nine months lapsed between the date of [plaintiff's] complaint and [defendant's] alleged adverse decisions"); *Clark County Sch. Dist.*, 532 U.S. 268 (noting that a court may not infer causation from temporal proximity unless the time between an employer's knowledge of protected activity and an adverse employment action is "very close" and citing cases for the proposition that a three-month and four-month time lapse is insufficient to infer causation). Thus, the Court finds there is no genuine fact dispute as to the causal link between Plaintiff's December 2014 termination and Plaintiff's 2009 and 2010 complaints.

Accordingly, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's ninths claim for violations of California Labor Code §§ 98.6 & 1102.5.

### D. Claim #10: Violation of Labor Code §§ 6310 & 6311

Defendant moves for summary judgment on Plaintiff's tenth claim, which asserts a right to recover for violations of California Labor Code §§ 6310 & 6311. Mot. at 22–23. The Court discusses both of Defendant's arguments below.

#### 1. California Labor Code § 6310

California Labor Code § 6310, which is a part of the California Occupational Safety and Health Act of 1973, provides that "[a]ny employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint . . . of unsafe working conditions, or work practices, in his or her employment or place of employment . . . shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer." "To establish a prima facie case of retaliation, a plaintiff must show that he or she engaged in a protected activity, that he or she was thereafter subjected to adverse employment action by his or her employer, and that there was a causal link

43

between the two." *Muller v. Auto. Club of So. California*, 61 Cal. App. 4th 431, 434 (1998), *disapproved of on other grounds by Colmenares v. Braemar Country Club, Inc.*, 29 Cal. 4th 1019, (2003).

Defendant argues that Plaintiff cannot demonstrate a fact issue because Plaintiff's complaints were not about unsafe working conditions, and Plaintiff cannot provide evidence that any adverse action was motivated by her complaints. Mot. at 22–23; Reply at 9–10. The Court agrees.

First, in her opposition, Plaintiff asserts—without citation—that she complained to Defendant about numerous unsafe working conditions, including "understaffing; the lack of food safety precautions for patients with swallowing difficulties; the abuse and/or mistreatment of patients; the intimidating and disruptive behavior of her co-workers; subordinates, and supervisors; *and other unnecessary risks to patient safety.*" Opp'n at 31 (emphasis added). However, California Labor Code § 6310 applies to only complaints about employee safety, not non-employees. *See, e.g.*, *Ferretti v. Pfizer, Inc.*, No. 11-CV-4486, 2012 WL 3638541, at *9 (N.D. Cal. Aug. 22, 2012) (stating that California Labor Code § 6310 should not "be extended to include situations where an employee reports a health risk that threatens harm to non-employee[s]"); *Creighton v. City of Livingsto*n, 628 F. Supp. 2d 1199, 1223 (E.D. Cal. 2009) (granting summary judgment on Section 6310 claim because allegations that "contaminated water posed a public health risk . . . [did] not satisfy § 6310's requirement that the employee complain of unsafe working conditions or an unsafe workplace"). Therefore, Plaintiff's putative complaints about patient safety do not support a finding of liability under California Labor Code § 6310.

Plaintiff's opposition further cites to a two-page article (three if you count the references) from July 9, 2008 by "The Joint Commission" that discusses how intimidating and disruptive behaviors can foster medical errors and contribute to poor patient satisfaction. Opp'n at 30; Ciarimboli Decl., Ex. 27 ("Joint Commission Article"). Plaintiff's opposition and the attached article describe only "The Joint Commission," with no further title. See Opp'n at 30–31; Joint Commission Article. It is not entirely clear from either document what "The Joint Commission"

44

is. The Court finds this article is unhelpful to Plaintiff's claim. First, the article itself does not not constitute evidence that Plaintiff actually complained to Defendant that Plaintiff or her co-workers were in physical danger or were in a dangerous work environment. Second, the article discusses the impact of workplace culture on patient safety. However, as discussed, California Labor Code § 6310 applies to only complaints about employee safety, not non-employees. *See, e.g.*, *Ferretti*, 2012 WL 3638541, at *9 (stating that California Labor Code § 6310 should not "be extended to include situations where an employee reports a health risk that threatens harm to non-employee[s]").

Finally, in her opposition, Plaintiff claims that she experienced adverse actions because of her complaints, Opp'n at 31. Indeed, Plaintiff's opposition states that "Defendant discriminated, harassed, and retaliated against Plaintiff because she reported concerns about patient care, services, facility conditions, intimidating and disruptive behaviors, and violations of the compliance statutes and regulations." *Id.* However, this is Plaintiff's only sentence in support of that argument and Plaintiff fails to provide any evidence that any of the alleged adverse actions were actually motivated by her complaints. The Court finds Plaintiff's arguments and allegations insufficient to demonstrate a genuine factual dispute as to California Labor Code § 6310.

### 2. California Labor Code § 6311

California Labor Code § 6311 provides that "[n]o employee shall be laid off or discharged for refusing to perform work in the performance of which this code, including Section 6400, any occupational safety or health standard or any safety order of the division or standards board will be violated, where the violation would create a real and apparent hazard to the employee or his or her fellow employees." Defendant argues that summary judgment is warranted on California Labor Code § 6311 because Plaintiff provides no allegation that she refused to work because of workplace safety concerns. Mot. at 23 n.6. Plaintiff does not respond to Defendant's argument. *See* Opp'n. The Court agrees with Defendant that Plaintiff's California Labor Code § 6311 claim fails because Plaintiff fails to show—let alone allege—that she refused to do some assigned task because of workplace safety concerns. *See, e.g.*, *Schaldach v. Health*, No. 2:12-CV-02492-MCE,

45

2013 WL 2292054, at *5 (E.D. Cal. May 23, 2013) ("Plaintiff has also failed to allege that she refused to work in an environment where there were health and safety violations that created real and apparent hazards to her or her fellow employees, and thus she is not entitled to relief under section 6311.").

Accordingly, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's tenth claim for violations of California Labor Code §§ 6310 & 6311.

### E. Punitive Damages

Finally, Defendant argues that Plaintiff is not entitled to punitive damages because she cannot show oppression, malice or fraud by a managing agent. Mot. at 26–28. Plaintiff does not oppose or otherwise respond to this argument. *See* Opp'n. The Court agrees with Defendant that Plaintiff is not entitled to punitive damages.

"An employer may be liable for punitive damages when "'the employer . . . ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice.'" *CRST, Inc. v. Superior Court*, 11 Cal. App. 5th 1255, 1262 (Cal. Ct. App. 2017) (quoting *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1148 (Cal. Ct. App. 1998); Cal. Civ. Code § 3294(b). With respect to a corporate employer, the "authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." Cal. Civ. Code § 3294(b). A "managing agent" is an employee that is "more than a mere supervisory employee" and is instead one who "exercises substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999). "An award of punitive damages under the statute must be supported by findings made on clear and convincing evidence." *CRST, Inc.*, 11 Cal. App. at 1262; *see also Mock v. Michigan Millers Mut. Ins. Co.*, 4 Cal. App. 4th 306 (Cal. Ct. App. 1992) (explaining that "clear and convincing" requires a finding of high probability; that the evidence be "so clear as to leave no substantial doubt"; or that the evidence be "sufficiently strong to command the unhesitating assent of every reasonable mind.").

Defendant has met its burden of identifying the portions of pleadings, discovery and

United States District Court
Northern District of California

46

affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Specifically, Defendant persuasively identifies evidence that none of the individuals that Plaintiff identified as her wrongdoers were one of Defendant's officers, directors, or manager agents. Cal. Civ. Code § 3294(b); *see* ECF No. 56-2 ("Hoops Decl.") ¶¶ 3–4; *see also id.*, Ex. A ("Job Descriptions"). This is significant because, with respect to a corporate employer, the "authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." Cal. Civ. Code § 3294(b).

For instance, Plaintiff alleged mistreatment by nurse Santosh Sahijpal, nurse Ligaya Rabi, nurse Jessie Bongato, nurse Helena Nijmeh, a nurse named "Joy," a nurse named "Jose," a scheduler named Aguilon, and a kitchen staff member named Tony Wu. *See, e.g.*, Amend. Compl. ¶¶ 11–16, 22, 24–26, 35, 53–54, 58–59, 72. However, these individuals were only staff that had no authority over Plaintiff. Rabara Dep. Vol. II at 386: 3–7 (Plaintiff admitting that Aguilon did not have supervisory authority over her). In fact, Plaintiff herself supervised some of these nurses. *See, e.g.*, Ciarimboli Decl., Ex. 4 (Plaintiff writing that nurse Rabi was insubordinate and disrespectful to Plaintiff, her supervisor).

Plaintiff further brought allegations against Assistant Directors of Nursing, Rodolfo Idian and Milagros Rhea, and the Director of Nursing, Jacinto. *See, e.g.*, Amend. Compl. ¶¶ 8–9, 15–17, 23–24. Although these individuals have supervisory authority over Plaintiff, Defendant points to evidence in the record that none of these individuals had any "discretionary authority" over corporate policy. *See* Hoops Decl. ¶ 3; *see also* Job Descriptions (explaining that an Assistant Director of Nursing must be able to "execute the terms and conditions set forth in the HCR ManorCare Employee Handbook"). This is significant because punitive damages are only available when the actor is "more than a mere supervisory employee" and instead is one who "exercises substantial discretionary authority over decisions that ultimately determine corporate policy." *White*, 21 Cal. 4th at 573.

Similarly, the HR staff against whom Plaintiff brought allegations, including HR Director Yadav, and acting HR Representative Grace Nunez, Amend Compl. ¶¶ 102–08, had administrative

47

1    functions with the company and had no discretion over corporate policy as they were obligated to

2    follow Defendant's Employee Handbook, Human Resources Policies and Procedures Manual, and

3    other corporate policies. *See* Hoops Decl. ¶ 4 (stating that HR Director Yadav and HR

4    Representative Grace Nunez did not have the "duty or authority to create or modify corporate

5    policy at any time during Plaintiff's employment from March 2009 to December 2014"); *see also*

6    Job Descriptions; *White*, 21 Cal. 4th at 573. Finally, none of the individuals who reviewed

7    Plaintiff's final leave request and decided to terminate Plaintiff's employment, including Regional

8    HR Director Marangi, Area HR Director Martin Mayhew, and Regional Director of Operations

9    John Gallick, were an officer, director or managing agent for Defendant, and the evidence shows

10   that each of them had a duty to follow corporate policy as it was established at the time. *See* Hoops

11   Decl. ¶¶ 4, 6 ("Each of the above persons had a duty to follow policies as described by

12   Defendant's Employee Handbook, Human Resources Policies and Procedures Manual, and other

13   corporate policies" and that "[n]one of these individuals had the "duty or authority to create or

14   modify corporate policy at any time during Plaintiff's employment from March 2009 to December

15   2014"); Marangi Decl. ¶ 3. This matters because punitive damages are only available when the

16   action was on the part of an officer, director, or managing agent of the corporation, Cal. Civ. Code

17   § 3294(b), or when the individual is someone who "exercises substantial discretionary authority

18   over decisions that ultimately determine corporate policy." *White*, 21 Cal. 4th at 573.

19           Second, Defendant persuasively identifies that none of the individuals that Plaintiff

20   identified as her wrongdoers acted with malice, oppression, or fraud. Mot. at 27–28. Malice is

21   defined as "conduct which is intended by the defendant to cause injury to the plaintiff or

22   despicable conduct which is carried on by the defendant with a willful and conscious disregard of

23   the rights or safety of others." Cal. Civ. Code § 3294(c)(1). Oppression is "despicable conduct that

24   subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* §

25   3294(c)(2). Despicable conduct is conduct that is "so vile, base, contemptible, miserable, wretched

26   or loathsome that it would be looked down upon and despised by ordinary decent people," or as

27   conduct "[having] the character of outrage frequently associated with crime." *Scott v. Phoenix*

28
                                                          48

*Schools, Inc.*, 175 Cal. App. 4th 702, 715 (Cal. Ct. App. 2009) (citations omitted). Fraud means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

Plaintiff alleges no malice, oppression, or fraudulent behavior by the individuals that she identified as her wrongdoers. Moreover, the California Court of Appeal has found that wrongful termination is not sufficient to show despicable conduct supporting punitive damages. *See Scott*, 175 Cal. App. 4th at 716 ("The only evidence of wrongful conduct directed toward Scott was her termination for an improper reason. This evidence was insufficient to support a finding of despicable conduct, because such action is not vile, base or contemptible."). In sum, the Court finds that Defendant has met its burden.

In opposition, Plaintiff fails to set forth *any* "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Because Plaintiff has failed to make this showing, Defendant, as "the moving party[,] is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. Accordingly, the Court GRANTS Defendant's motion for summary judgment on punitive damages.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 26, 2019

LUCY H. KOH
United States District Judge